# IN THE UNITED STATES DISTRICT COURT
# FOR THE NORTHERN DISTRICT OF ILLINOIS
# EASTERN DIVISION

| | | |
|---|---|---|
| Leroy Jacobs, Abdou Barry, Leroy Midyette, Francis Clay, Carla McCoy, Jessica Moore, Jonas Harger, Raynard Owens, and Oliver Toneybey | ) ) ) ) ) | No. 05 C 6718 |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | |
| | ) | |
| Walgreen Co. | ) | |
| | ) | |
| Defendant. | ) | |

## MEMORANDUM OPINION

SAMUEL DER-YEGHIAYAN, District Judge

This matter is before the court on Defendant Walgreen Co.'s ("Walgreens") motions for summary judgment. For the reasons stated below, we deny Walgreens' motions for summary judgment except for the claim brought by Jonas Harger ("Harger").

## BACKGROUND

Plaintiffs Leroy Jacobs ("Jacobs"), Abdou Barry ("Barry"), Leroy Midyette ("Midyette"), Harger, Raynard Owens ("Owens"), and Oliver Toneybey ("Toneybey")(collectively referred to as "Customer Plaintiffs") allege that they were

1

customers at various Walgreens retail stores located in the Chicagoland area. Plaintiffs Francis Clay ("Clay"), Carla McCoy ("McCoy"), and Jessica Moore ("Moore")(collectively referred to as "Employee Plaintiffs") allege that during 2004 and 2005 they were employed at the Walgreens store located at the intersection of Chicago Avenue and Michigan Avenue in Chicago, Illinois ("Michigan Avenue Store"). Jacobs was allegedly a customer at the Michigan Avenue Store in 2003 and 2004. Midyette and Barry allegedly were customers at the Michigan Avenue Store between May 1, 2004 and November 2004. On November 20, 2005, Harger was allegedly a customer at a Walgreens store located in Hanover Park, Illinois ("Hanover Park Store"). Between July 1, 2003 and November 30, 2004, Owens was allegedly a customer at a Walgreens store located at the intersection of Belmont Avenue and Broadway Street in Chicago, Illinois ("Belmont Store"). Between June 1, 2003 and November 30, 2004, Toneybey was allegedly a customer at a Walgreens store located at the intersection of Clark Street and Ontario Street in Chicago, Illinois ("Clark Store").

Customer Plaintiffs claim that when they entered the Walgreens stores as customers they were harassed by Walgreens employees. Specifically, Customer Plaintiffs allege that they were closely followed by Walgreens employees and the employees stood near Customer Plaintiffs when they inspected merchandise as if they were suspected of being shoplifters. Customer Plaintiffs also claim that they were forced to provide proof of purchase for merchandise purchased in the stores, were detained in the stores, and were barred from the stores without sufficient

justification. Customer Plaintiffs contend that they were unfairly treated because of their race.

Employee Plaintiffs claim that they were ordered to follow a Walgreens policy ("Policy") under which African-American customers were presumed to be criminals. The Policy, which was allegedly formulated by Caucasian supervisors, required the Employee Plaintiffs to follow African-American customers around the Michigan Avenue Store to ensure that they did not steal any merchandise. Employee Plaintiffs also claim that they were discriminated against because of their race and received harsher discipline, less sick leave, less work accommodations, and were unfairly treated under the seniority system. Employee Plaintiffs also claim that they were forced to do work that Caucasian employees refused to perform and that Caucasian supervisors used racial epithets when speaking to African-American employees at the Michigan Avenue Store. Plaintiffs include in their amended complaint claims alleging an interference with their right to make contracts in violation of 42 U.S.C. § 1981 ("Section 1981") (Count I), and Section 1981 hostile work environment claims (Count II). Walgreens has moved for summary judgment on all claims except for the claims brought by Clay.

## LEGAL STANDARD

Summary judgment is appropriate when the record, viewed in the light most favorable to the non-moving party, reveals that there is no genuine issue as to any

material fact and the moving party is entitled to judgment as a matter of law.  Fed. R. Civ. P. 56(c).  In seeking a grant of summary judgment the moving party must identify "those portions of 'the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any,' which it believes demonstrate the absence of a genuine issue of material fact." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986)(quoting Fed. R. Civ. P. 56(c)).  This initial burden may be satisfied by presenting specific evidence on a particular issue or by pointing out "an absence of evidence to support the non-moving party's case." *Id.* at 325.  Once the movant has met this burden, the non-moving party cannot simply rest on the allegations in the pleadings, but, "by affidavits or as otherwise provided for in [Rule 56], must set forth specific facts showing that there is a genuine issue for trial."  Fed. R. Civ. P. 56(e).  A "genuine issue" in the context of a motion for summary judgment is not simply a "metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986).  Rather, a genuine issue of material fact exists when "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986); *Insolia v. Philip Morris, Inc.*, 216 F.3d 596, 599 (7th Cir. 2000).  The court must consider the record as a whole, in a light most favorable to the non-moving party, and draw all reasonable inferences that favor the non-moving party. *Anderson*, 477 U.S. at 255; *Bay v. Cassens Transport Co.*, 212 F.3d 969, 972 (7th Cir. 2000).

**DISCUSSION**

Plaintiffs' claims are all based upon Section 1981, which provides as follows:

(a) Statement of equal rights

All persons within the jurisdiction of the United States shall have the same right in every State and Territory to make and enforce contracts, to sue, be parties, give evidence, and to the full and equal benefit of all laws and proceedings for the security of persons and property as is enjoyed by white citizens, and shall be subject to like punishment, pains, penalties, taxes, licenses, and exactions of every kind, and to no other.

(b) "Make and enforce contracts" defined
For purposes of this section, the term "make and enforce contracts" includes the making, performance, modification, and termination of contracts, and the enjoyment of all benefits, privileges, terms, and conditions of the contractual relationship.

(c) Protection against impairment
The rights protected by this section are protected against impairment by nongovernmental discrimination and impairment under color of State law.

42 U.S.C. § 1981.

I.  Interference with Right to Make Contracts Claims (Count I)

Customer Plaintiffs argue that Walgreens interfered with their right to make contracts because of their race in violation of Section 1981.  A retail customer can bring a Section 1981 claim based upon a "refusal of service."  *See, e.g., Morris v. Office Max, Inc.*, 89 F.3d 411, 413 (7th Cir. 1996)(stating that customers could bring a Section 1981 claim).

A. Leroy Jacobs

Walgreens argues that some of the allegations presented by Jacobs are untimely and also argues that the incidents alleged by Jacobs that are timely do not show a violation of Section 1981.

1. Statute of Limitations

Walgreens argues that some of Jacobs' allegations are untimely. There is a two-year statute of limitations period for Section 1981 claims. *Walker v. Abbott Laboratories*, 340 F.3d 471, 474 (7th Cir. 2003); *Vakharia v. Swedish Covenant Hosp.*, 190 F.3d 799, 807 (7th Cir. 1999); *Smith v. City of Chicago Heights*, 951 F.2d 834, 837 (7th Cir. 1992). In response to Walgreens' statement of material facts, Jacobs acknowledges that his Section 1981 claim is partly based upon misconduct that occurred on April 9, 2003, on April 10, 2003, and on November 9, 2003. (R WSF Par. 11, 29, 42). Jacobs brought the instant action on November 28, 2005, and thus his allegations concerning misconduct by Walgreens employees that occurred prior to November 28, 2003 might technically be untimely.

Jacobs argues that under the continuing violation doctrine the court should consider the allegations concerning misconduct that occurred prior to November 28, 2003. The Seventh Circuit has indicated that the continuing violation doctrine applies to Section 1981 claims in the context of employment discrimination. *Dandy v. United Parcel Service, Inc.*, 388 F.3d 263, 270 (7th Cir. 2004). Under the doctrine, although a statute of limitations period generally begins to run on the date

that the plaintiff is injured, the period does not begin running "when it 'would be unreasonable to expect the plaintiff to perceive offensive conduct,' or when the earlier violation may be recognizable as actionable only in light of later events." *Pitts v. City of Kankakee, Ill.*, 267 F.3d 592, 595 (7th Cir. 2001)(quoting *Hardin v. S.C. Johnson & Son, Inc.*, 167 F.3d 340, 344 (7th Cir. 1999)).

Jacobs testified at his second deposition that he first had negative experiences at Walgreens in April 2003. (4/5 J. Dep. 97). Jacobs stated that when he entered Walgreens on April 9, 2003 he believed that he was being followed around the store by a Walgreens employee. (4/5 J. Dep. 99-100). Jacobs also claimed that when he entered a Walgreens store on April 10, 2003 with Midyette, he was followed by a security guard. (4/5 J. Dep. 121-22). Jacobs indicated at his deposition that the incidents "upset" him and that he was "irked" by the fact that he was being followed around the store. (4/5 J. Dep. 100, 124). However, there is not sufficient evidence to find as a matter of law that Jacobs understood or reasonably should have understood that he was being followed because of his race and that his rights were being injured. In fact, Jacobs testified that during the April 10, 2003 incident he asked the security guard why he was following him, which supports a conclusion that Jacobs was not certain as to why he was being followed. Any customer might be annoyed if they were followed and suspected of shoplifting when they were merely shopping, but a reasonable customer would not understand that any legal injury was being done to them until the customer had a sufficient basis to conclude that they were being mistreated for some unlawful reason. It is possible, based on the evidence in this

case, that the incidents that occurred prior to November 28, 2003, did not provide Jacobs with a sufficient basis to conclude that he was being discriminated against based on his race.

There may have been other possible reasons that Jacobs was being followed that are not ruled out by the record before us. There is also further evidence that shows that Jacobs did not fully comprehend the wrong being done to him until after November 28, 2003. Jacobs claims that after November 28, 2003, the alleged mistreatment of Jacobs escalated significantly. Jacobs testified during his deposition that on May 13, 2004, he was followed by a Walgreens employee and was told to leave the Michigan Avenue Store. (4/5 J. Dep. 194-95, 210-14). The May 13, 2004 incident is the first incident mentioned in the record when Jacobs was told to leave the store. Under Jacobs' version of the events on May 13, 2004, which we must consider since Jacobs is the non-movant, Jacobs was approached by a group of Walgreens employees "in an aggressive manner," was told by a Walgreens employee to "get the 'F' out of the store," and was "ushered" out of the store. (4/5 J. Dep. 195). Based upon such evidence, it is possible that prior to November 28, 2003, when Jacobs was allegedly followed in the store, Jacobs might have thought that it was a mere coincidence that he was being mistreated or that the Walgreens employees just did not personally like Jacobs. It is also possible that when on May 13, 2004, Walgreens allegedly ejected Jacobs from the store in an aggressive manner without justification that Jacobs would have had a sufficient basis to conclude that his race played a significant role in his current and prior alleged mistreatment. The

record is such that only the trier of fact can make a determination as to whether the incidents that occurred prior to November 28, 2003, can be considered under the continuing violation doctrine. After the mistreatment of Jacobs was allegedly escalated in 2004, Jacobs brought the instant action in a timely fashion. Therefore, we decline Walgreens' request to find as a matter of law that Jacobs' allegations regarding incidents that occurred prior to November 28, 2003 are time-barred.

### 2. Right to Contract and Intent Elements

Walgreens also argues that Jacobs cannot show that Walgreens interfered with his right to make contracts or that Walgreens employees intended to discriminate against him because of his race. For a Section 1981 claim, plaintiffs must establish that: "(1) they are members of a racial minority; (2) the defendant had an intent to discriminate on the basis of race; and (3) the discrimination concerned one or more of the activities enumerated in the statute (i.e., the making and enforcing of a contract)." *Morris*, 89 F.3d at 413.

Walgreens contends that there is not sufficient evidence to show that the alleged misconduct by Walgreens employees interfered with Jacobs' right to make contracts. Jacobs thus has pointed to evidence that indicates that he was inhibited in his ability to purchase items at the Michigan Avenue Store on May 13, 2004 when Jacobs was allegedly confronted by a group of Walgreens employees "in an aggressive manner," was told by a Walgreens employee to "get the 'F' out of the store," and was "ushered" out of the store. (4/5 J. Dep. 195). Walgreens argues that

Jacobs' ability to make contracts in regards to the purchase of merchandise at Walgreens was not further affected because Jacobs admitted to continuing to shop at other Walgreens stores after May 13, 2004. (Reply WSJ J 7); (4/5 J. Dep. 231). However, even if true that Jacobs was not denied access to other Walgreens stores, Jacobs has made sufficient allegations that show that Walgreens employees interfered with his ability to make a contract when they denied him access to the Michigan Avenue Store on May 13, 2004. Thus, Walgreens has not pointed to sufficient evidence that would conclusively show that Jacobs was not impaired in his ability to make contracts at the Michigan Avenue Store. The trier of fact must assess the evidence and credibility of the testimony at trial in order to determine if the third element mentioned above for a Section 1981 claim could be established by Jacobs. In addition, there are genuinely disputed facts concerning the alleged incidents that occurred prior to November 28, 2003, involving the denial of service to Jacobs.

Walgreens also argues that there is not sufficient evidence that shows that it intended to discriminate against Jacobs because of his race. Walgreens argues that Jacobs was asked to leave the Michigan Avenue Store on May 13, 2004 because Jacobs used a "heavy tone" and "heated words" when speaking to a Walgreens employee. (WSF SJ J Par. 59-60). However, there is not a clear picture of the events that occurred on May 13, 2004 that would enable this court to find in favor of Walgreens as a matter of law. For example, while the facts presented by the parties show that Walgreens employees and Jacobs had an argument on May 13, 2004, it is not clear whether Jacobs or the Walgreens employee initiated the argument. It is also

not clear precisely what was said and when and whether the Walgreens employee had been watching Jacobs and suspected that he was going to steal something because Jacobs is African-American. Under Jacobs' version of events, Jacobs was approached by a group of Walgreens employees "in an aggressive manner," was told by a Walgreens employee to "get the 'F' out of the store," and was "ushered" out of the store. (4/5 J. Dep. 195). Walgreens can present its version of the facts to the trier of fact and the trier of fact can determine whether Jacobs was told to leave the Michigan Avenue Store for a legitimate reason or whether the Walgreens employees were acting in an impermissible manner and told Jacobs to "get the 'F' out of the store" because he is African-American. (4/5 J. Dep. 195).

Jacobs has pointed to evidence that indicates that he was followed by Walgreens employees on multiple occasions while he was a customer at a Walgreens store and that the employees did not have justification to do so. He has also pointed to evidence that shows that he is African-American and that on May 13, 2004, when he entered the Michigan Avenue Store, a Walgreens employee chose specifically to monitor him under the false perception that he might steal something. Jacobs also points to evidence that indicates that without provocation, a group of Walgreens employees ejected him from the store. Based upon such evidence, it is possible that a reasonable trier of fact, after hearing all the evidence, and assessing the credibility of all the testimony, would conclude that the Walgreens employees intended to discriminate against Jacobs because of his race. Therefore, we deny Walgreens' motion for summary judgment on the claims brought by Jacobs in its entirety.

B.  Abdou Barry

Walgreens argues that Barry has not pointed to sufficient evidence that shows that Walgreens interfered with Barry's right to make contracts and that there is not sufficient evidence of Walgreens' discriminatory intent.  Barry claims that on one occasion a Walgreens employee pointed a finger at him and told him not to leave the store without paying for the merchandise he was holding.  Barry also claims that when he was a customer at Walgreens stores he was followed by Walgreens employees.

Walgreens contends that Barry has not presented evidence that shows that Walgreens actually interfered with Barry's right to make contracts.  In support of Walgreens' position it cites *Morris v. Office Max, Inc.*, 89 F.3d 411 (7th Cir. 1996).  In *Morris*, the Court held that"[a] claim for interference with the right to make and enforce a contract must allege the actual loss of a contract interest, not merely the possible loss of future contract opportunities."  *Id.* at 414.

Walgreens argues that the Court in *Morris* considered the fact that the plaintiff customers did not try to make a purchase at the defendant store after the discrimination and thus were not actually prevented from making a purchase.  Walgreens, therefore, argues that since Barry was not specifically prevented from purchasing an item, he cannot prevail on his Section 1981 claim.  *Id.*  However, in this regard, *Morris* is distinguishable from the instant action.  In *Morris*, the plaintiffs were African-American customers at the defendant store and the assistant manager who thought the plaintiffs looked suspicious called the police to the store to

investigate why the plaintiffs were loitering in the store. *Id.* at 412. When the police arrived and determined that the plaintiffs were shopping and not engaging in any unlawful activity, the plaintiffs were allowed to continue their shopping at the store. *Id.* The Court in *Morris* noted that "because [the plaintiffs] did not attempt to make any further purchases, [the defendants] never sought to enter into a contractual relationship with" the defendant store. *Id.* at 414. However, in *Morris* the police were called to the store, the police spoke with the defendants, the defendants were asked to produce their driver's licenses and were cleared of any suspicion by the police. Under those circumstances, the assistant manager had the assurance of the police that the defendants were not a threat to the store. In such a situation, the plaintiffs could reasonably have believed that the suspicion that they were thieves had been cleared up by the police and the plaintiffs did not have further reason to believe that they would be denied service if they sought service. The fact that the plaintiffs in *Morris* did not then try to purchase anything would be relevant to determine whether their right to make contracts was actually interfered with by the defendant store.

In the instant action, however, unlike in *Morris*, Barry contends that he was followed around the store by Walgreens employees because they suspected him of shoplifting. Under those circumstances Barry could have reasonably believed that the suspicions against him continued while he was in the store. It is not clear from the record whether Barry refrained from purchasing certain merchandise or shopping in certain sections of the Walgreens stores because he was convinced that he would

be accosted by Walgreens employees and accused of being a shoplifter if he did so. Barry also claims that on one occasion as he was leaving a Walgreens store wearing the hat he had on when he entered the store, when an employee at the cash register pointed a finger at him and said, "you better not go out the door without paying for that hat." (Barry Dep. 29). Based upon Barry's version of the events during the incidents at the Walgreens, Barry could reasonably have been forced to limit or restrict his shopping at the Walgreens stores out of fear that he would be unjustly arrested or asked to leave the store.

In addition, in *Bagley v. Ameritech Corp.*, 220 F.3d 518 (7th Cir. 2000), the Court commented on the holding in *Morris* noting that in *Morris* the Court "held that the store did not deny [the defendants] of [the right to make contracts] since there was no evidence that it refused them admittance or *service*." *Id.* at 520 (emphasis added). In the instant action, there is evidence that indicates that although Barry was able to enter the Walgreens store and not specifically told to leave, he reasonably could have believed that he would have suffered severe consequences even though he did nothing wrong.

Also, the mere fact that Barry purchased items at a Walgreens store does not mean that he was provided with full service as any other Caucasian customer would receive. For example, one part of the "service" offered by a store and part of the process of entering into a contract to purchase items from a store, is the willingness of store employees to answer questions concerning merchandise. Based on Barry's version of the events, Barry possibly could have believed that such a service was not

available to him.

This court's application of the holding in *Morris* is more sensible than the one advocated by Walgreens, under which a plaintiff is barred from any relief solely based upon the technicality that the customer was not kicked out of a store or that the customer did not ask to buy something and received a negative response. Based on the specific facts in the instant case, if a customer such as Barry is being humiliated and intimidated by Walgreens store employees and is inhibited from exercising his right to make contracts that is accorded to all citizens, there is no reason why Barry should be required to seek to purchase an item that Barry believes he will not be allowed to purchase. There is no reason why, in order to show a violation of his Section 1981 rights, Barry must be forced to subject himself to further humiliation and possibly be thrown out of the store or unjustly arrested by trying to purchase an item. In *Morris*, the police came to the store and established that the plaintiff customers were not thieves and the plaintiffs had no further reason to believe that they could not try and purchase items without retribution. In the instant action, there is evidence that shows that Barry had reasons to believe that he was not going to be allowed to shop for items as any other person would in the Walgreens store. Whether or not Barry actually was inhibited in his ability to make contracts and whether that was a reasonable belief on his part is a matter for the trier of fact to determine. In addition, if Barry had acted in an uninhibited fashion, whether the employees at Walgreens would have provided normal shopping services or instead would have taken other unjustifiable actions against Barry is a matter for the trier of

fact to determine. Finally, this court's application of the holding in *Morris* is also consistent with the language of Section 1981 itself that provides that all citizens shall "have the same right . . . to make and enforce contracts" and the full enjoyment of those rights. 42 U.S.C. § 1981. Having the same shopping privileges which are directly tied to a customer's right to make contracts, is consistent with full enjoyment of those rights. Based upon the above, we deny Walgreens' motion for summary judgment on Barry's claim.

### C. Leroy Midyette

Walgreens argues that Midyette has not pointed to sufficient evidence that shows that Walgreens interfered with Midyette's right to make contracts and that there is not sufficient evidence that shows that Walgreens intended to discriminate against Midyette because of his race. Midyette claims that on May 8, 2004, while he was a customer at a Walgreens store, a store manager accused Midyette of stealing a Gatorade bag which he had already purchased. According to Midyette, when he entered the store the next day on May 9, 2004, the store manager told him to leave the store and prevented him from purchasing any goods. There is sufficient evidence presented to possibly conclude that Walgreens interfered with Midyette's right to make contracts on May 9, 2004. Walgreens even acknowledges that on May 9, 2004, Midyette "arguably was prevented from making or enforcing a contract." (Reply WSJ Mid. 7). In addition, as we explained in regards to Barry's claims, the evidence relating to Midyette also is unclear as to whether Midyette was inhibited in

the exercise of his right to make contracts and as to whether all shopping services at the Walgreens store that were available to Caucasian customers were also available to Midyette, an African-American. Thus, Midyette has pointed to sufficient evidence that indicates Walgreens interfered with his right to make contracts. The determination of whether Walgreens actually interfered with Midyette's right to make contracts can only be made by the trier of fact. In regards to the intent element for Midyette's claim, Midyette has pointed to evidence that shows that he was falsely accused of stealing merchandise and barred from entry into a Walgreens store on May 9, 2004. Such actions are extreme measures and there is no indication that similar measures were taken against Caucasian customers that entered the store. Midyette did not indicate that he perceived any Caucasian customers being questioned by the store manager regarding merchandise that they had purchased or whether any Caucasian customers were barred from the store. The record is such that only the trier of fact can determine whether the store manager accused Midyette of stealing and barred him from the store because of his race or for some other legitimate reason. Therefore, we deny Walgreens' motion for summary judgment on Midyette's claims.

D. Jonas Harger

Walgreens argues that Harger has not pointed to sufficient evidence that shows that Walgreens interfered with Harger's right to make contracts. Harger claims that on November 20, 2005, he went to the Hanover Park Store to purchase

juice boxes for his nephew.  Harger contends that when he could not find the juice boxes, he asked a Walgreens employee at the camera section if they had any juice boxes.  Harger claims that the employee told him that "either they did not carry them or if they did they would be in an aisle the employee pointed out to" him.  (Harger Decl. Par. 4).  Harger further claims that as he was walking out of the store he had paper money in his hand which was not noticeable, and the Manager of the Walgreens store asked Harger what he had in his hand.  Harger states that after he showed the Manager the money in his hand, he walked out of the store and the Manager did not say anything.

Harger has failed to point to evidence that shows that he was refused any service in the Walgreens store or that he was asked to leave the store.  The one isolated incident described by Harger when he was asked what was in his hand is not sufficient to show that his right to make contracts was inhibited.  Based on the above, we grant Walgreens' motion for summary judgment on the claim brought by Harger.  The Court in *Morris* noted that *"*[w]hile the incident that [the plaintiffs] experienced was unfortunate and undoubtedly disconcerting and humiliating, it does not constitute a violation of the statutes." *Id.*  Likewise, in the instant action,  the conduct of Walgreens Manager, if true, would be reprehensible, and unquestionably humiliating to Harger and cannot be condoned.   However, it does not constitute a violation of Section 1981 which Harger's claim is based upon.


E.  Raynard Owens

Walgreens argues that certain allegations concerning Owens' claim are time-barred.  Walgreens also argues that Owens has not pointed to sufficient evidence that shows that Walgreens interfered with Owens' right to make contracts and that there is not sufficient evidence that shows that Walgreens intended to discriminate against Owens because of his race.

1. Statute of Limitations

Owens claims that on July 6, 2003, he was followed around the Belmont Store and was ultimately told to leave the store.  Owens also claims that on July 10, 2003, August 1, 2003 and August 8, 2003, he was told to leave the Belmont Store.  As is indicated above, any incidents that occurred prior to November 28, 2003 might technically be untimely.  However, Owens argues that the incidents that occurred prior to November 28, 2003 should be considered under the continuing violation doctrine.  There is evidence that indicates that beginning in July 2003 and possibly before that time that there was a poor relationship between the Walgreens store employees and Owens.  Owens could possibly have not understood prior to November 28, 2003 that the alleged mistreatment of himself by the employees was due to Owens' race.  It is reasonably possible that the alleged harassment of Owens by Walgreens employees that occurred after November 28, 2003, on July 30, 2004, and in December 2005 placed Owens on notice that there was an ongoing effort to discriminate against him because of his race.  Based upon the totality of the evidence, we conclude that such a determination can only be made by the trier of fact.

Therefore, we decline Walgreens request to find as a matter of law that Owens' allegations regarding incidents that occurred prior to November 28, 2003 are time-barred.

2. Right to Contract and Intent Elements

Walgreens also argues that Owens has not pointed to sufficient evidence that shows that Walgreens interfered with Owens' right to make contracts and that there is not sufficient evidence that shows that Walgreens intended to discriminate against Owens because of his race. Owens claims that on July 30, 2004, while he was a customer at a Walgreens store, an employee used a racial epithet against Owens. At that time, Owens was wrongly accused of shoplifting and was told to leave the store and never come back. (Ans. WSJ Ow. 3). Owens admits that he was able to complete his intended purchase on July 30, 2004, and that he was allegedly confronted after he paid for his merchandise when he was leaving the store. (Ans. WSJ Ow. 3); (Owens Dep. 145). However, Owens testified at his deposition that he was also barred entry to the Belmont Store in December 2005. (Owens Dep. 31-36). Thus, Owens has pointed to sufficient evidence that shows that Walgreens interfered with his right to contract. In addition, as we explained in regards to Barry's claims, the evidence relating to Owens also is unclear as to whether Owens was inhibited in the exercise of his right to make contracts and as to whether all services at the Walgreens store that were available to Caucasian were also available to Owens.

In regards to the intent element, Owens has pointed to evidence that indicates

that in July 2004 he was unjustly accused of shoplifting and told not to return to the Belmont Store. Owens has also pointed to evidence that shows that he was barred entry into the Belmont Store in December 2005. Although Walgreens contends that its employees had justification for any actions taken by Walgreens, the record in this matter is such that only the trier of fact could determine whether the accusations of shoplifting against Owens and the denial of entry of Owens into the Belmont Store were related to Owens' race or were because of some legitimate reason. Only the trier of fact can determine if Walgreens employees intended to discriminate against Owens because of his race. Based on the above, we deny Walgreens' motion for summary judgment on the claim brought by Owens in its entirety.

### F. Oliver Toneybey

Walgreens argues that certain allegations concerning Toneybey's claims are time-barred. Walgreens also argues that Toneybey has not pointed to sufficient evidence that shows that Walgreens interfered with Toneybey's right to make contracts.

### 1. Statute of Limitations

Toneybey claims that beginning in 2000 and before April 2003 he was followed around by Walgreens employees when he was a customer at Walgreens stores. Toneybey also claims that in April 2003, and the summer of 2003, he was confronted by Walgreens employees who were watching him closely as if he was

intending to steal something. As is indicated above, allegations concerning incidents that occurred prior to November 28, 2003 might technically be untimely. However, Toneybey argues that the court should consider the alleged incidents that occurred prior to November 28, 2003 under the continuing violation theory. Toneybey has alleged that in February 2004 he was followed around the Clark Store as if he was stealing something. Based on the totality of the evidence relating to Toneybey, Toneybey's ability to shop at Walgreens stores in the same manner as Caucasian customers may have been impeded. It is reasonably possible that Toneybey did not discover until February 2004 that the harassment against him which occurred before November 28, 2003, was due to his race. Such a determination can only be made by the trier of fact. Therefore, we decline Walgreens' request to find as a matter of law that Toneybey's allegations regarding incidents that occurred prior to November 28, 2003 are time-barred.

## 2. Right to Contract and Intent Elements

Walgreens argues that Toneybey has not pointed to sufficient evidence that shows that Walgreens interfered with Toneybey's right to make contracts because Toneybey was allowed to purchase items at Walgreens stores. However, as we explained in regards to Barry's claims, the evidence relating to Toneybey also is unclear as to whether Toneybey was inhibited in the exercise of his right to make contracts and as to whether all services at the Walgreens store that were available to Caucasian customers were also available to Toneybey. In regards to the intent

element, Toneybey has pointed to evidence that shows that he is African-American and that he was singled out and followed when he entered the Walgreens stores. One possible inference is that the Walgreens employees followed Toneybey because of his race. Therefore, we deny Walgreens' motion for summary judgment on Toneybey's claims in its entirety.

## II. Hostile Work Environment Claims (Count II)

Walgreens argues that there is not sufficient evidence to support the Employee Plaintiffs' hostile work environment claims. For a Section 1981 hostile work environment claim, a plaintiff must establish that: "(1) [s]he was subject to unwelcome harassment; (2) the harassment was based on h[er] race; (3) the harassment unreasonably interfered with h[er] work performance by creating an intimidating, hostile, or offensive working environment that seriously affected h[er] psychological well-being; and (4) there is a basis for employer liability." *Herron v. DaimlerChrysler Corp.*, 388 F.3d 293, 302 (7th Cir. 2004)(quoting *Hrobowski v. Worthington Steel Co.,* 358 F.3d 473, 476 (7th Cir. 2004)). The plaintiff must also show that "the objectionable environment was both subjectively and objectively offensive." *Herron*, 388 F.3d at 302.

### A. Carla McCoy

Walgreens argues that the alleged harassment against McCoy was not based on her race and was not sufficiently severe or pervasive.

1. Whether Harassment was Based on McCoy's Race

Walgreens argues that there is insufficient evidence that shows that McCoy was harassed because of her race. McCoy contends that she is African-American, (R WSF Mc. Par. 1), and that Walgreens employees who were Caucasian were treated more favorably than African-American employees in regards to matters such as seniority, shift assignments, disciplinary actions, sick leave, work accommodations, employee purchases, and work duties. There are genuinely disputed facts concerning whether such discrimination occurred.

McCoy also claims that she was forced to follow African-American customers around the Michigan Avenue Store. McCoy testified at her deposition that when a supervisor wanted her to follow a customer the supervisor would announce a "Code 5" over the intercom system. (McCoy Dep. 14). McCoy claims that all of the customers that she was told to follow were African-American and that she was never ordered to follow any Caucasian customers. (McCoy Dep. 17). McCoy also claims that when she confronted her supervisor and asked why she was asked only to follow African-American customers, her supervisor stated that she should follow all suspicious customers. (McCoy Dep. 21). However, it was McCoy's impression that the supervisor was merely attempting to deflect any wrongdoing and that the supervisor's statement was not consistent with her conduct. (McCoy Dep 19-20). McCoy testified that if a "Code 5" was called for a Caucasian customer and McCoy left her register to follow the customer that she would get in trouble for leaving the register. (McCoy Dep. 20). In light of the evidence which indicates that McCoy was

possibly discriminated against because of her race, including evidence that McCoy's supervisors indicated that they believed that African-Americans are more likely to be thieves, and evidence relating to seniority, we conclude that we cannot determine as a matter of law that McCoy was not harassed because of her race.

### 2. Whether Harassment was Sufficiently Severe or Pervasive

Walgreens argues that the alleged harassment was not sufficiently severe or pervasive. As is explained above, there are genuinely disputed facts concerning whether McCoy was discriminated against in her job in terms of matters such as seniority and in regards to whether McCoy was forced by her supervisors to follow only African-American customers. The trier of fact must resolve such issues. Therefore, based on the above, we deny Walgreens' motion for summary judgment on the claim brought by McCoy in its entirety.

### B. Jessica Moore

Walgreens argues that the alleged harassment against Moore was not based on her race and was not sufficiently severe or pervasive.

### 1. Whether Harassment was Based on Moore's Race

Walgreens argues that there is not sufficient evidence that shows that the alleged harassment against Moore was related to Moore's race. Moore claims that she was forced to follow African-American customers around the Michigan Avenue

Store to make sure that they did not steal anything.  Moore also claims that she was subjected to racial slurs and epithets by her supervisors.  In addition, Moore also claims that she observed that African-American customers suspected of shoplifting were detained while Caucasian customers suspected of shoplifting were allowed to leave the store.  Moore also claims that she was discriminated against because of her race in regards to matters such as shift assignments, promotions, and break times.

Walgreens argues that Moore never testified at her deposition that she heard any supervisor make statements that included racial slurs or epithets.  (R SAF Par. 56).  However, Walgreens has not pointed to any portion of Moore's deposition during which she was asked such a question.   Moore was asked questions specifically in regards to Ms. Napoli ("Napoli") in the portion of Moore's deposition cited by Walgreens, but was not asked about all supervisors.  (Moore Dep. 113). Moore has provided a declaration indicating that she heard supervisors make statements that included racial slurs or epithets.  (Moore Decl. Par 21).  Moore also testified at her deposition that when she made a complaint to Ms. Kwon ("Kwon"), Kwon said, "That's the problem with you black people, you always complain," and "Ain't nothing ever good enough for you."  (Moore Dep. 85).  Moore also testified that Napoli and Kwon would use the phrase "you's people" when talking to Moore. (Moore Dep. 85-87).  Although Walgreens argues that there is not sufficient evidence to conclude that the phrase "you's people" was intended to refer in general to African-American people, it is also true that there is not sufficient evidence to conclude the opposite as a matter of law.  There are sufficiently disputed facts

concerning Moore's claims that can only be resolved by the trier of fact after reviewing the evidence in this case.

Moore also contends that she was told by Walgreens supervisors to follow African-American customers around the Chicago Avenue Store to make sure that they did not steal anything. (Moore Dep. 83). Although Moore did not recall the exact words used by a supervisor, Moore indicated that the supervisor conveyed to Moore that the store policy was to follow African-American customers. (Moore Dep. 82-83). Moore also testified that all the customers that she was instructed to follow were African-American. (Moore Dep. 137). In addition, Moore testified that she never in her work observed a Caucasian suspected of shoplifting that was detained and that all the customers that she saw detained were African-American. (Moore Dep. 121-22). Although Walgreens takes issue with the accuracy of Moore's observations, and the actual policy of Walgreens, the credibility and accuracy of Moore's observations can only be assessed by the trier of fact. In light of the totality of the evidence in this case, we conclude that there is sufficient evidence of an animus against Moore because of her race that creates a genuinely disputed issue as to whether Walgreens supervisors intended to discriminate against Moore because of her race.

2. Severity and Frequency of Alleged Harassment

Walgreens argues that the alleged harassment is not sufficiently severe or frequent. Moore has pointed to evidence that indicates that her supervisors made

statements concerning racial slurs and epithets.  Moore has also pointed to evidence that shows that her supervisors made negative statements in reference to African-American people in general.  Moore has also pointed to evidence that shows that she was told to follow African-American customers because such customers were suspected of shoplifting in light of their race.  Moore has also pointed to evidence that shows that she observed that only suspected shoplifters that were African-American were detained.  Such facts regarding following and detaining African-American customers, if true, could reasonably have led Moore to conclude that her supervisors did not trust her and held an animus toward her because she was African-American.  We conclude, based on the totality of the evidence, that there is sufficient evidence that shows that the alleged harassment was sufficiently severe and frequent to create a genuinely disputed issue as to whether Moore was subjected to a hostile work environment.  Based on the above, we deny Walgreens' motion for summary judgment on the claim brought by Moore.  We note that Walgreens contends that Moore has not pointed to sufficient evidence to support a Section 1981 retaliation claim, but Plaintiffs specifically listed in the amended complaint the claims they intended to bring and Moore has not indicated in her response brief that she intends to bring a retaliation claim.  Thus, Walgreens' arguments in regards to a retaliation claim are moot.

## CONCLUSION

Based on the foregoing analysis, we deny Walgreens' motion for summary

judgment in its entirety on the claims brought by Jacobs, Barry, Midyette, Owens, Toneybey, McCoy, and Moore.  We grant Walgreens' motion for summary judgment on the claim brought by Harger.

Samuel Der-Yeghiayan
United States District Court Judge

Dated:  November 30, 2006